FILED

SEP 3 0 2016

CLERK

UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| LAURA DZIADEK,<br><br>Plaintiff,<br><br>vs.<br><br>THE CHARTER OAK FIRE INSURANCE COMPANY, d/b/a Travelers,<br><br>Defendant. | 4:11-CV-04134-RAL<br><br><br>OPINION AND ORDER ON POST TRIAL MOTIONS |

Plaintiff, Laura Dziadek (Dziadek), sued Defendant, Charter Oak Fire Insurance Company, doing business as Travelers (Charter Oak), making claims sounding in contract and tort relating to a commercial insurance policy issued by Charter Oak (the Policy). Doc. 15. Dziadek's Amended Complaint asserted that she was entitled to declaratory judgments that she is an insured under the Policy's underinsured motorist (UIM) endorsement with Charter Oak owing her a duty of good faith and fair dealing, that $1,000,000 of UIM coverage for her exists under the Policy, and that she is an insured under the Policy's medical payments endorsement. Doc. 15 at ¶¶ 15–51. Dziadek further alleged that Charter Oak breached the insurance contract and engaged in unfair trade practices, fraud and deceit, and bad faith in its dealings with Dziadek. Doc. 15 at ¶¶ 52–95. She sought compensatory damages, punitive damages, and attorney's fees. Doc. 15 at ¶¶ 96–102; Doc. 15 at 13–14. Charter Oak acknowledged coverage after the lawsuit

1

was filed and, on February 21, 2012, paid Dziadek $900,000 under the Policy's UIM coverage[1] and $5,000 under the Policy's medical payments coverage. After discovery, Charter Oak moved for summary judgment on all claims. Doc. 118. This Court granted summary judgment on the unfair trade practices claim but otherwise denied Charter Oak's motion. Doc. 153 at 28. The case proceeded to a jury trial in May 2016.

On May 27, 2016, the jury returned a verdict for Dziadek on the claims of deceit and breach of contract for UIM coverage. Doc. 300. The jury found for Charter Oak, however, on Dziadek's claims of breach of contract for medical payments coverage, insurance bad faith, and fraud. Doc. 300. The jury awarded prejudgment interest on the $900,000 of UIM coverage from December 15, 2009, on both the deceit claim and the breach of contract for UIM benefits claim, $250,000 for out-of-pocket expenses on the deceit claim, plus an additional $500,000 for "[a]ny other harm . . . including mental and emotional harm."[2] Doc. 300. The jury then, in phase two of the trial, returned a verdict for Dziadek on her punitive damages claim for $2.75 million. Doc. 305.

On May 31, 2016, this Court entered a preliminary judgment on the jury verdict, but identified three issues that required resolution: (1) whether Dziadek's declaratory judgment claims are now moot; (2) whether a 10% prejudgment interest rate or some different rate applies to calculate prejudgment interest; and (3) whether a deceit claim can support an award for "mental and emotional harm." Doc. 311. Both parties have filed briefs on the three issues

[1]Charter Oak under South Dakota law was entitled to an offset from the $1,000,000 UIM limits for the $100,000 received from Progressive Insurance Company, the tortfeasor's insurer. See S.D. Codified Laws (SDCL) § 58-11-9.5; Kirchoff v. Am. Cas. Co., 997 F.2d 401, 402 n.2 (8th Cir. 1993).
[2]This Court drafted a verdict form that separated out non-economic damages such as for mental and emotional harm, both to assure to avoid possible recovery of double damages on the various claims and because this Court believed that such non-economic damages were recoverable on only one claim under South Dakota law—the insurance bad faith claim.

discussed in the preliminary judgment. Charter also moved for judgment as a matter of law on the claims of deceit and breach of contract for UIM coverage, as well as the punitive damages award. Doc. 317. Charter Oak alternatively moved for a new trial on these claims. Doc. 318.

## I. Summary of Facts

Charter Oak issued the commercial insurance policy at issue to Billion Empire Motors, Inc. (Billion), an auto dealership in Sioux Falls, South Dakota, for the period of July 1, 2008 to July 1, 2009. Pl.'s Ex. 25. The Policy included UIM and medical payments coverage. Pl.'s Ex. 25. Billion loaned one of its vehicles to a customer, Lori Peterson (Peterson), while her vehicle was in for repairs. Peterson and Dziadek took a trip together to the Black Hills, during which Dziadek stopped at a hospital to do some nursing work. On September 22, 2008, while returning from the Black Hills, Peterson lost control of the Billion vehicle in or near a construction zone on Interstate 90 in South Dakota, causing the vehicle to crash in a ravine. Doc. 313-6 at 22–28. Dziadek was a passenger in the Billion vehicle driven by Peterson and was very badly injured. Dziadek hired Jeffrey A. Cole (Cole) of Zimmer, Duncan, and Cole in December 2008 to represent her in matters stemming from that motor vehicle accident.

The Policy contained a provision titled, "Duties In The Event Of Accident, Claim, Suit Or Loss," which required the named insured, Billion, to provide notice of accident or loss. Pl.'s Ex. 25. Charter Oak[3] received notice of the accident from Billion's insurance agent on January 29, 2009, and on that same day, Faith Styles (Styles), Charter Oak's claims representative, began to investigate. Def.'s Ex. 1034. Styles learned that Peterson was the driver in a single car

---

[3]Charter Oak is the only named defendant and the insurance carrier that issued the Policy. Charter Oak has no employees and is owned as part of the Travelers group of insurance companies. The Travelers Indemnity Company (TTIC) runs Charter Oak and all of the administration of Charter Oak is done by TTIC and its employees. This Opinion and Order refers to Charter Oak rather than TTIC because the distinction between the two entities is immaterial to most issues in this case.

accident and that Peterson may have fallen asleep while driving to cause the accident. Def.'s Ex. 1034. She also learned that Dziadek was a passenger in the car at the time of the accident, that Dziadek was seriously injured as a result of the accident, and that Peterson was insured under a Progressive Insurance Company (Progressive) policy. Def.'s Ex. 1034. Styles contacted a Progressive adjuster and learned that Peterson had a $100,000 liability coverage limit under the Progressive policy, that Dziadek was a nurse, and that Dziadek's medical bills already had exceeded $100,000. Def.'s Ex. 1034. Shortly thereafter, on February 2, 2009, Styles received information about Dziadek's injuries from Dziadek's sister, Mae Schafer (Schafer). Def.'s Ex. 1034. As a result of injuries from the accident, Dziadek's vocal cords were partially paralyzed so Schafer communicated with Styles on Dziadek's behalf. Def.'s Ex. 1034. Styles began referring to Dziadek as a "claimant" in her claims notes and assigned her a claim number. Def.'s Ex. 1034.

On February 6, 2009, Styles created a "Bodily Injury Worksheet" for Dziadek which included a liability analysis; she assigned 0% liability for Dziadek and Billion and 100% liability for Peterson. Def.'s Ex. 1095; Doc. 313-12 at 66. Styles spoke with Cole that same day. Def.'s Ex. 1034. Cole testified at trial that although he could not remember the exact words of his February 6, 2009 telephone conversation with Styles, Doc. 313-6 at 112; Doc. 313-7 at 87, he knew they discussed insurance coverage for Dziadek under the Billion Policy, Doc. 313-6 at 112, 116. A note Cole made while speaking with Styles recorded:

> Garage Policy
> Claim no coverage
> Claim no excess coverage

Pl.'s Ex. 1; Doc. 313-6 at 113. Cole testified that he believed that Styles said there was no coverage of any kind for Dziadek under the Billion Policy. Doc. 313-6 at 114–116; see also

4

Doc. 313-6 at 120. According to Cole, he was interested in any type of coverage for Dziadek; he therefore did not have any reason to focus on liability coverage only when speaking with Styles. Doc. 313-6 at 116, 120.

Styles met with her supervisor Tim Westbrook and an in-house coverage lawyer on February 12, 2009. Def.'s Ex. 1034; Doc. 313-11 at 94. According to Styles's testimony, the three Charter Oak employees determined that the Policy did not provide liability coverage for Peterson. Doc. 313-11 at 94.

Styles then wrote a letter to Cole that same day regarding "YOUR CLIENT: Laura Dziadek." Pl.'s Ex. 3. The letter stated:

> We have reviewed the facts of this loss in conjunction with the policy issued to our insured and it is our determination that no coverage for your client exists under this policy. Under the terms of the policy, Lori Peterson's liability coverage would be primary. If she did not have insurance or if the limits of her policy were less than the minimum required limits for South Dakota, then she would qualify as an insured under our insured's policyat [sic] amount is $25,000. It is my understanding that Ms. Peterson had a liability limit of $100,000 so she would not qualify as an insured under this policy.

Pl.'s Ex. 3. Cole understood the letter as meaning that there was no coverage for Dziadek under any of the provisions in the Billion Policy. Doc. 313-6 at 119–20. Nevertheless, Cole sent Styles a letter on February 18, 2009, requesting the declaration sheet for the Billion Policy and "a true and correct copy" of the Policy itself. Doc. 313-6 at 121; Pl.'s Ex. 4. Styles sent Cole the declarations page, but only excerpts of the Policy defining an "insured" for purposes of liability coverage, together with a letter telling Cole to "pay particular attention to the pages which I have marked because they address the issue of 'who is an insured.'" Pl.'s Ex. 7; Doc. 313-11 at 116–17. Styles did not send Cole the Policy provisions on UIM or medical payments coverage that Dziadek actually met.

5

Cole testified that in his experience, he could trust that an insurance adjustor would send the applicable policy provisions when asked to do so. Doc. 313-7 at 36. He explained that he had never dealt with a commercial garage policy like the Billion Policy. To Cole, it made sense that the definition of an insured that Styles sent him applied to the entire policy. Doc. 313-7 at 39–40. Because Dziadek was not an insured under the definition of an insured Styles sent him, Cole did not follow up with Charter Oak at that time.

Progressive offered Peterson's $100,000 liability limits to Dziadek on February 24, 2009, in exchange for a full release. Pl.'s Ex. 6; Doc. 313-6 at 122–23. Cole declined the offer because Dziadek's medical bills already had exceeded $100,000, because Dziadek was receiving workers' compensation benefits, and because Cole was hopeful to collect more from Peterson, possibly from other alleged tortfeasors, and their insurers. Doc. 313-6 at 122–24.

Cole spent the next two years pursuing other avenues of recovery for Dziadek. He hired an investigator to determine whether a problem with the Billion vehicle caused the accident, but found nothing to support that theory. Doc. 313-7 at 24. He pursued workers' compensation coverage for Dziadek. He sued Peterson in September 2009. Doc. 313-7 at 22; Def. Ex. 1014. About one year later, Cole and another attorney in his office, Daniel Brendtro (Brendtro), filed a second lawsuit on Dziadek's behalf against the State of South Dakota, a road contractor, and a signage company (DOT case), alleging that the configuration and maintenance of the Interstate 90 construction zone caused or contributed to the accident. Doc. 313-7 at 4–8; Doc. 313-12 at 84–85, 89. By June 2011, however, discovery in the DOT case had convinced Cole and Brendtro that Dziadek did not have a viable claim against the defendants in the DOT case. Doc. 313-7 at 8.

More than two years had passed since Styles had communicated with Cole and provided information that there was no coverage under the Policy for Dziadek. Before accepting Progressive's $100,000 limits, Brendtro decided to pour through the firm's Dziadek file to see if something possibly was missed. Doc. 313-12 at 91–92. Looking back at what Styles had sent, Brendtro found a reference to UIM coverage in the declarations page, Doc. 313-12 at 95–96, and realized that the UIM provision was not part of the provisions Styles had sent, Doc. 313-12 at 102–03; Doc. 313-13 at 56–57. Brendtro instructed his paralegal Jennifer Doubledee (Doubledee) to contact Styles for a copy of the entire policy. Doc. 313-12 at 97. Doubledee called Styles on July 15, 2011, asking for the entire Policy, but Styles refused to send it, saying that the Policy could be over 2,000[4] pages and that Doubledee would need to request specific provisions. Doc. 313-12 at 100; Pl.'s Ex. 19. Doubledee emailed Styles back that same day asking only for the UIM and uninsured motorist provisions. Doc. 313-12 at 101; Def. Ex. 1055. Styles, however, did not immediately send the requested policy provisions. Def. Ex. 1055; Doc. 313-12 at 101. After Doubledee repeated her request on July 21, 2011, Styles provided the UIM and uninsured motorist policy provisions to Cole and Brendtro's firm on July 22, 2011. Def. Ex. 1055.

Brendtro reviewed the UIM policy language and on July 28, 2011, sent Styles a letter seeking to confirm that Dziadek had UIM coverage under the Policy. Def.'s Ex. 1056. Charter Oak received the letter on August 1, 2011, but did not respond.[5] When Charter Oak still had not responded by September 20, 2011, Dziadek filed this lawsuit. Charter Oak's answer admitted the existence of UIM coverage and medical payments coverage for Dziadek, although it denied other claims and matters.

---

[4]The entire Policy is actually approximately 200 pages. Pl.'s Ex. 25.
[5]Charter Oak witnesses said that they think the letter was lost in TTIC files.

On January 17, 2011, Cole ultimately demanded that Charter Oak pay both the UIM and medical payments limits. Def.'s Ex. 1070. Cole then requested assent from Charter Oak to settle Dziadek's claims against Peterson and Progressive for the $100,000 liability limit on February 3, 2012. Def.'s Ex. 1071. Charter Oak, on February 16, 2012, consented to that settlement and also consented to Dziadek's dismissal of the DOT case. Def.'s Ex. 1075. On February 21, 2012, Charter Oak sent two checks totaling $905,000 to pay the UIM and medical payments coverage claims of Dziadek. Def.'s Ex. 1076. Charter Oak did not pay any interest on these amounts, and Dziadek did not release any claims against Charter Oak.

Charter Oak's defenses at trial included that it had done nothing wrong because Cole had not made a claim for UIM coverage in February 2009. Charter Oak argued that Cole should have realized that UIM coverage was available and made a request for payment under the UIM provision earlier. Charter Oak also claimed at trial that the delay in receiving the $905,000 actually benefited Dziadek in terms of the money she received from workers' compensation. The jury obviously rejected Charter Oak's defense theories on the breach of contract, deceit, and damages claims.

## II. Motion for Judgment as a Matter of Law and Motion for New Trial

### A.     Standards

Rule 50(b) allows a party that previously moved for judgment as a matter of law to renew that motion after entry of final judgment. Judgment as a matter of law is proper "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). In diversity cases such as this, a court considering a motion for judgment as a matter of law typically applies the sufficiency-of-the-evidence standard of the state in which it sits, at least

8

where the state and federal standards are similar. Mich. Millers Mut. Ins. Co. v. Asoyia, Inc., 793 F.3d 872, 877–78 (8th Cir. 2015). The federal sufficiency-of-the-evidence standard is essentially the same as the South Dakota standard: courts draw all reasonable inferences in the nonmoving party's favor and, without weighing the evidence, determine whether there is a sufficient evidentiary basis to support the verdict. Garcia v. City of Trenton, 348 F.3d 726, 727 (8th Cir. 2003); Stensland v. Harding Cty., 872 N.W.2d 92, 95 (S.D. 2015). Judgment as a matter of law should be granted only when "all of the evidence points in one direction and is susceptible to no reasonable interpretation supporting the jury verdict." Garcia, 348 F.3d at 727 (quotation omitted); accord Stensland, 872 N.W.2d at 95 ("If sufficient evidence exists so that reasonable minds could differ, judgment as a matter of law is not appropriate." (quoting Huether v. Mihm Transp. Co., 857 N.W.2d 854, 860 (S.D. 2014))).

The standard for granting a new trial under Rule 59 is different. White v. Pence, 961 F.2d 776, 779–82 (8th Cir. 1992). The governing question under Rule 59 is whether a new trial is required to avoid a miscarriage of justice. Greaser v. Mo. Dep't of Corrs., 145 F.3d 979, 983 (8th Cir. 1998). Grounds for granting a new trial include a verdict that is against the weight of the evidence, an excessive damage award, and erroneous jury instructions or evidentiary rulings. Children's Broad. Corp. v. Walt Disney Co., 245 F.3d 1008, 1017 (8th Cir. 2001). "In determining whether a verdict is against the weight of the evidence, the trial court can rely on its own reading of the evidence—it can 'weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict.'" White, 961 F.2d at 780 (quoting Ryan v. McDonough Power Equip., 734 F.2d 385, 387 (8th Cir. 1984)). However, district courts may not "reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other

results are more reasonable." Id. (quoting Fireman's Fund Ins. Co. v. Aalco Wrecking Co., 466 F.2d 179, 186 (8th Cir. 1972)). Erroneous evidentiary rulings do not justify a new trial "unless [the wrongful admission or exclusion of] the evidence was so prejudicial that a new trial would likely produce a different result." Diesel Mach., Inc. v. B.R. Lee Indus., Inc., 418 F.3d 820, 834 (8th Cir. 2005) (quoting Harrison v. Purdy Bros. Trucking Co., 312 F.3d 346, 351 (8th Cir. 2002)). Similarly, courts will grant a new trial based on erroneous jury instructions "only 'if the error misled the jury or had a probable effect on its verdict.'" Bamford, Inc. v. Regent Ins. Co., 822 F.3d 403, 410 (8th Cir. 2016) (quoting Acuity v. Johnson, 776 F.3d 588, 596 (8th Cir. 2015)).

### B.   Deceit

In denying Charter Oak's motion for summary judgment on Dziadek's deceit claim, this Court concluded that Charter Oak had an obligation to refrain from making statements intended to deceive Dziadek about the coverage available to her and that this obligation was separate and apart from Charter Oak's duties under the Policy. Doc. 153 at 22–23. Charter Oak moved to reconsider, arguing first that the deceit claim failed under the independent tort doctrine and second that Charter Oak did not owe Dziadek a duty to disclose information about the UIM coverage. Doc. 173. This Court denied Charter Oak's motion to reconsider, explaining that a contractual relationship does not insulate a party from fraud claims and reiterating that Charter Oak had an obligation to refrain from deceiving Dziadek about the existence of coverage for her that was independent of its duties under the Policy. Doc. 218 at 11–12. Charter Oak raised the duty issue again during settling of instructions when it argued that, under the Supreme Court of South Dakota's decision in Taggart v. Ford Motor Credit Co., 462 N.W.2d 493 (S.D. 1990), parties in arm's-length business transactions have no duty to disclose absent an employment or

fiduciary relationship.  Doc. 313-13 at 113.  Relying in part on Trouten v. Heritage Mutual Insurance Co., 632 N.W.2d 856 (S.D. 2001), this Court concluded that the relationship of an insurer to its insured is akin to that of a fiduciary rather than a typical arm's-length business transaction.  Doc. 313-13 at 112.  Moreover, Charter Oak did not simply fail to disclose the existence of $900,000 of UIM coverage available to Dziadek, but actively deceived Dziadek and her attorney into believing that there was no such coverage.  Charter Oak once again raises the same arguments it asserted previously.

Dziadek's deceit claim is a tort action separate though related to an insurance contract. The Supreme Court of South Dakota has recognized that "'an omission to perform a contract obligation is never a tort,' but . . . that the breach of a legal duty upon which a tort is based 'may arise out of a relation or state of facts created by contract.'"  Karas v. Am. Family Ins. Co., 33 F.3d 995, 998 (8th Cir. 1994) (quoting Smith v. Weber, 16 N.W.2d 537, 539 (S.D. 1944)).  As a result, "[w]hile the matters complained of . . . [may have] had their origin in a contract, the gist of the action is for alleged wrongful and tortious acts of defendant."  Id. (alterations in original) (quoting Smith, 16 N.W.2d at 539).  Here, Charter Oak had a legal duty not to violate the South Dakota deceit statutes, SDCL Ch. 20-10, in providing information to Dziadek and her attorney Cole.  Charter Oak had an obligation to refrain from making statements intended to deceive Dziadek about the existence of coverage for her, separate and apart from its duties under the Policy.  See Grynberg v. Citation Oil & Gas Corp., 573 N.W.2d 493, 501 (S.D. 1997) (finding duty independent of the obligations under the contract and stating, "[s]imply put, a contract is not a license allowing one party to cheat or defraud the other").  Even though the torts "grow out of" or are "coincident with" the Policy, Charter Oak is "not immune . . . from the penalty that is ordinarily visited upon tort-feasors."  Smith, 16 N.W.2d at 539.

Charter Oak argues next that Dziadek failed to present sufficient evidence to prove deceit. Dziadek had to prove six elements to succeed on her deceit claim: (1) Charter Oak had a duty to disclose a material fact to Dziadek; (2) Charter Oak willfully concealed a material fact or willfully gave information of other facts which were likely to mislead because of Charter Oak's failure to communicate the material fact; (3) Charter Oak acted with the intent to induce Dziadek to alter her position to her injury or risk; (4) the undisclosed information was something Dziadek could not discover by acting with reasonable care; (5) Dziadek relied on the lack of information to her detriment; and (6) Dziadek was legally caused damages as a result. Doc. 229 at 24; SDCL §§ 20-10-1 to 20-10-2. South Dakota Pattern Jury Instructions: Civil § 20-110-25 (2008 ed. with 2016 revisions).

Charter Oak focuses on the fourth element first, arguing that Dziadek failed to show that the existence of UIM coverage for her was something Cole could not have discovered by acting with reasonable care. The evidence is sufficient to find in Dziadek's favor on the fourth element of deceit. Cole asked Styles whether there was any type of coverage available for Dziadek under the Policy. Doc. 313-6 at 114–120. Despite Styles telling Cole on the phone and later in writing that no coverage existed, Doc. 313-6 at 114–116; Pl.'s Ex. 3, Cole followed up and asked Styles for a copy of the entire Policy, Doc. 313-6 at 121; Pl. Ex. 4. Styles responded by sending Cole a portion of the policy containing a definition of insured under which Dziadek did not qualify and a letter telling Cole to pay particular attention to this definition. Pl. Ex. 7; Doc. 313-11 at 117. Cole, who had never dealt with a commercial garage policy before and whose experience taught him that he could trust a claims adjuster to send the applicable policy provisions when asked to do so, believed that the definition of an insured Styles sent him applied to the entire Policy. Doc. 313-7 at 36, 39–40. Charter Oak's argument has irony to it; Charter Oak is essentially arguing

that trusting what Charter Oak had said, written, and sent is not exercising reasonable care. A reasonable jury could conclude from the evidence that Cole and in turn Dziadek could not have discovered the deceit by acting with reasonable care.

Charter Oak next complains that Dziadek failed to prove the second and third elements of deceit. Again, there is a sufficient evidentiary basis for the jury's decision on these elements. First, Styles was no stranger to UIM coverage in February 2009; she handled one or two UIM claims a month, Doc. 313-11 at 88, and had received praise from her supervisor in January 2009 for seeking offsets on UIM claims, Pl.'s Ex. 158. Second, by the time Styles spoke with Cole on February 6, 2009, she knew enough to realize that the Policy's UIM provision might apply to Dziadek. Specifically, Styles knew that Dziadek had been seriously injured in an accident which Peterson had caused, that Peterson's insurance policy with Progressive had a $100,000 liability coverage limit, and that Dziadek's medical bills already had exceeded $100,000. Def.'s Exs. 1034, 1095. Third, Styles orally and in writing told Cole there was no coverage under the Policy for Dziadek when, in fact, Dziadek met the UIM provision's definition of an insured. Doc. 313-6 at 114–116; Pl.'s Ex. 3. Fourth, rather than send Cole the entire Policy as he asked, Styles sent Cole provisions of the Policy under which Dziadek could not recover. Pl.'s Ex. 7; Doc. 313-11 at 117. Finally, Styles refused to send Doubledee the entire Policy in July 2011, stating erroneously that the Policy could be over 2,000 pages. Doc. 313-12 at 100; Pl.'s Ex. 19. She also delayed sending the UIM provision until Doubledee requested the provision a second time. Doc. 313-12 at 101; Def. Ex. 1055. A reasonable jury could conclude that Charter Oak in 2009 willfully misled Dziadek and Cole about the existence of UIM coverage with the intent to avoid having to pay Dziadek the $900,000.

Charter Oak's last argument about the elements of deceit is that Dziadek failed to show that she relied on Charter Oak's misleading statements concerning the existence of coverage under the Policy. Ample evidence supported the jury's finding on this element as well. Dziadek testified that she relied on the insurance company to "do the right thing" in addition to relying on Cole. Doc. 313-6 at 76. Cole, in turn, relied on Styles's misleading statements that Dziadek did not have any coverage under the Policy. Cole and Dziadek delayed for over two years accepting Progressive's tender of its limits and pursued an ultimately futile lawsuit against defendants named in the DOT case, because of a reliance on Charter Oak's 2009 statements and letters.

Charter Oak also makes two arguments concerning the jury's verdict on deceit in its motion for a new trial. Charter Oak argues first that it is entitled to a new trial on the deceit claim for the same reasons expressed in its motion for judgment as a matter of law. Although the standard for a new trial is less stringent than the standard for judgment as a matter of law, the evidence discussed above demonstrates that there was no miscarriage of justice in the jury's finding for Dziadek on the deceit claim. This Court cannot order a new trial simply because the jury conceivably could have drawn different conclusions. White, 961 F.2d at 780.

Charter Oak complains second that it was error not to define the words "willfully" and "materially" in the jury instruction on deceit. Charter Oak argued during trial that this Court should define "willfully," Doc. 313-13 at 20, but did not propose an instruction defining this term, either before the jury's verdict or in its post-trial motions, see Docs. 197, 285, 319, 320, 339, 340. A court within this district has held that a party must offer a proposed instruction along with the party's objection to preserve a claim of instructional error. Skrovig v. BNSF Ry. Co., 916 F. Supp. 2d 945, 970 (D.S.D. 2013). Even if Charter Oak preserved its argument, it has not cited any cases holding that "willfully" is a technical term that must be defined for the jury.

14

Instead, Charter Oak notes that after this Court defined the term "reckless" at the jury's request, the jury found in Charter Oak's favor on the fraud and bad faith claims.[6] Docs. 295, 209. Charter Oak then speculates that the jury misunderstood the term "willfully" and might have found for Charter Oak on the deceit claim if that term been defined. This argument overlooks that Dziadek's three tort claims had different elements and that she faced issues proving fraud and bad faith that she did not face in proving deceit. The more reasonable inference is that the jury understood the term "willfully" but still found that Charter Oak engaged in deceit. After all, the jury sent a jury note asking for a definition of "reckless," but did not ask for a definition of "willfully." The jury demonstrated that it knew how to seek guidance during deliberations on a term in the jury instructions on which it was unclear. Charter Oak's arguments do not establish that the failure to define "willfully" was in error or had a probable effect on the outcome of this case.

Charter Oak's argument that this Court should have defined "material" is similarly unconvincing. Charter Oak wanted an instruction stating that "a misrepresentation is not material if the person has consulted a lawyer before acting, and the lawyer is charged by law with having knowledge of the fact represented." Doc. 197 at 45. The only support Charter Oak offered for this instruction was the South Dakota pattern jury instruction on attorney malpractice. Doc. 197 at 45. The South Dakota pattern instruction on attorney malpractice does not mention the word "material," let alone support Charter Oak's proposed instruction that a plaintiff's consultation with a lawyer can render a fact immaterial. And even if Charter Oak had a legal basis for its proposed instruction on the word "material," it has not shown that the failure to give this instruction had a probable effect on the jury's verdict.

---

[6] The jury instructions on fraud and bad faith both used the word "recklessly." Doc. 299 at 23, 21.

## C.    Breach of Contract

Charter Oak argued that it could not be liable for breach of contract to Dziadek because it eventually paid Dziadek the $900,000 owed for UIM coverage, albeit after Dziadek discovered the deceit and after Dziadek sued Charter Oak. The elements for breach of contract under South Dakota law typically are "(1) an enforceable promise; (2) a breach of the promise; and, (3) resulting damages." Bowes Constr., Inc. v. S.D. DOT, 793 N.W.2d 36, 43 (S.D. 2010). Charter Oak's Policy is the enforceable promise or contract at issue. However, Charter Oak argued that it did not breach the contract and that Dziadek has no breach-of-contract damages. Doc. 133 at 21–25.

UIM is excess insurance to underlying liability coverage, and a person seeking UIM coverage must satisfy certain conditions precedent to recover UIM benefits. Specifically, Dziadek had to notify Charter Oak of her intention to accept the underlying liability limits, allow Charter Oak an opportunity to exercise its Schmidt/Clothier[7] rights, make a formal demand for UIM benefits, and show damages above the limits of the underinsured motorist.

Under South Dakota law, a contract may be unenforceable when it contains a condition precedent that fails to occur and may be unenforceable until the condition precedent occurs. See Weitzel v. Sioux Valley Heart Partners, 714 N.W.2d 884, 896 (S.D. 2006); see also Johnson v. Coss, 667 N.W.2d 701, 705–06 (S.D. 2003) ("A condition precedent is a contract term distinguishable from a normal contractual promise in that it does not create a right or duty, but instead is a limitation on the contractual obligations of the parties."). South Dakota law recognizes the prevention doctrine as an exception to the requirement of a condition precedent to

---

[7]South Dakota has adopted the Schmidt/Clothier notice procedure. See Anderson v. W. Nat'l Mut. Ins. Co., 857 F. Supp. 2d 896, 899 n.6 (D.S.D. 2012); Helmbolt v. LeMars Mut. Ins. Co., 404 N.W.2d 55, 59–60 (S.D. 1987).

contract performance. Weitzel, 714 N.W.2d at 896. The South Dakota Supreme Court adopted

the prevention doctrine as stated in the Restatement (Second) of Contracts:

> Where a duty of one party is subject to the occurrence of a condition, the
> additional duty of good faith and fair dealing imposed on him . . . may require
> some cooperation on his part, either by refraining from conduct that will prevent
> or hinder the occurrence of that condition or by taking affirmative steps to cause
> its occurrence. . . . [N]on-performance of that duty when performance is due is a
> breach. . . . [I]t has the further effect of excusing the non-occurrence of the
> condition itself, so that performance of the duty that was originally subject to its
> occurrence can become due in spite of its non-occurrence.

Johnson, 667 N.W.2d at 706 (alterations in original) (quoting Restatement (Second) Contracts

§ 245 cmt. (a)). Stated another way, "if a party to a contract hinders the occurrence of a

condition precedent, that condition is waived." Id. This doctrine "requires that the conduct have

'contributed materially' to the non-occurrence of the condition." Id. (quotation omitted).

Application of the prevention doctrine is a question of fact reserved for the jury. Id.; see also

Berry v. Time Ins. Co., 798 F. Supp. 2d 1015, 1020–21 (D.S.D. 2011) (denying motion to

dismiss on contract claim because prevention doctrine may excuse condition precedent where

insured did not negotiate as required by the policy, initially provided inconsistent information to

insured, and later imposed nonexistent and heighted restrictions). Therefore, this Court

submitted to the jury Dziadek's breach of contract claim and whether Charter Oak prevented

Dziadek from formalizing her UIM claim at an earlier time.

     Charter Oak makes four arguments for why it is entitled to judgment as a matter of law

on Dziadek's breach of contract claim. To succeed on her breach of contract claim, Dziadek had

to show: (1) that the Policy contained an enforceable promise to her; (2) that Charter Oak

breached that promise by preventing her from formalizing her UIM claim; and (3) that Charter

Oak's breach legally caused Dziadek's damage. Doc. 299 at 15. The jury found that Charter

Oak breached the contract for UIM benefits and, if not for Charter Oak's actions, Dziadek would have formalized her UIM claim on December 15, 2009. Doc. 300 at 1.

Charter Oak argues first that Dziadek had to establish the amount she was entitled to recover from <u>any</u> tortfeasor to become entitled to UIM benefits. Charter Oak's first argument fails because, as explained more fully below, neither the Policy nor South Dakota law imposed such a requirement.

Charter Oak argues next that Dziadek could not have formalized her UIM claim until October 2011 because that is the first date she submitted any medical records to Charter Oak. This argument has no merit because it ignores the jury's finding that Charter Oak prevented Dziadek from formalizing her UIM claim earlier. Having been deceived by Charter Oak into thinking there was no coverage under the Policy, neither Cole nor Dziadek would have any reason to submit medical records to Charter Oak in 2009 or 2010.

Charter Oak's next argument is equally baseless. Charter Oak contends that the prevention doctrine does not apply here because Dziadek had not satisfied the conditions precedent to receiving UIM benefits when it deceived her in 2009. Again, this argument overlooks the obvious fact that Charter Oak's deceit is the reason Dziadek did not attempt to satisfy the conditions precedent in 2009.[8]

---

[8]Charter Oak's motion for judgment as a matter of law also includes this argument: "The Court erred in failing to instruct the Jury correctly as to the Prevention Doctrine and its limitations. <u>See</u> Restatement (Second) of Contracts § 245, cmt. (b) (noting that 'if it can be shown that a condition would not have occurred regardless of the lack of cooperation, the failure of performance did not contribute materially to its non-occurrence and the rule [the Prevention Doctrine] does not apply.')." Doc. 319 at 31. Charter Oak apparently missed the following sentence from this Court's instructions on the prevention doctrine: "If it can be shown that the condition precedent would not have occurred regardless of the prevention or hindrance, the prevention or hindrance did not contribute materially to the non-occurrence of the condition and there has been no breach of contract." Doc. 299 at 16.

Charter Oak's final contention is that it did not breach the contract because it eventually paid Dziadek full policy benefits. But the jury found that Charter Oak breached the insurance contract by preventing Dziadek from submitting her UIM claim for $900,000 sooner. And Charter Oak's breach of contract damaged Dziadek because it never paid Dziadek interest on the $900,000, to which she was entitled under South Dakota law. See SDCL § 21-2-2 ("The detriment caused by the breach of an obligation to pay money only is deemed to be the amount due by the terms of the obligation with interest thereon."). Charter Oak's motion for judgment as a matter of law on Dziadek's contract claim is denied.

Charter Oak in its motion for a new trial argues that Instruction 15, which is the breach of contract instruction, failed to properly instruct the jury on the preconditions Dziadek had to satisfy to be entitled to UIM benefits under the Policy. The first precondition listed in Instruction 15 stated that to be entitled to UIM benefits, Dziadek needed to: "reach a resolution—whether by a judgment against, a tender of liability limits from, or a settlement—with any underinsured motorist and/or any insurance carrier for such underinsured motorist (in Dziadek's case Peterson, Progressive, and, if it were liable, Billion Empire Motors, Inc.)." Doc. 299 at 16. Charter Oak contends that the jury should have been instructed that Dziadek had to reach a settlement with *any* tortfeasor, not just any underinsured motorist. As explained at trial, this Court spent a great deal of time drafting Instruction 15 because it was unique to this case. This Court considered but rejected Charter Oak's arguments that the Policy and South Dakota case law required that Dziadek reach a resolution with any conceivable tortfeasor before she was entitled to UIM benefits. Doc. 313-1 at 6; Doc. 313-2 at 4. Charter Oak's motion for a new trial rehashes these same arguments.

19

Charter Oak's argument concerning South Dakota law relies on <u>Farmland Insurance Cos.</u>

<u>v. Heitmann</u>, 498 N.W.2d 620 (S.D. 1993). In <u>Heitmann</u>, a woman was struck and killed by a

drunk driver while riding her bike. The driver of the vehicle was insured for $25,000 and the

owner of the vehicle was insured for $100,000. The women and her husband had an insurance

policy with $100,000 in UIM coverage. The husband demanded the $100,000 in UIM coverage

from his insurer without ever demanding payment from the driver or owner of the vehicle. The

insurer brought a declaratory judgment action to determine its obligation to pay UIM benefits.

The trial court granted summary judgment for the insurer and the husband appealed. The

Supreme Court of South Dakota affirmed the trial court's decision. First, the Court held that

SDCL § 58-11-9.5, South Dakota's UIM statute, limits the amount of UIM coverage to the

difference between the UIM "coverage limits on the vehicle of the insured less the amount paid

by the liability insurer of the underinsured motorist."[9] <u>Heitmann</u>, 498 N.W.2d at 625. Second,

the Court rejected the husband's argument that the insurer could not apply any offset to the UIM

coverage until damages were actually paid by the tortfeasor. <u>Id.</u> According to the Court, "the

amount recoverable under UIM coverage is not a matter of timing; the limit of UIM coverage is

not dependent on whether the UIM claim is made before or after the UIM insured has disposed

of his or her claim against the tortfeasor." <u>Id.</u> (quoting <u>Broton v. W. Nat'l Mut. Ins. Co.</u>, 428

N.W.2d 85, 90 (Minn. 1988)). "Here," the Court explained, "the liability insurance proceeds

available from the tort-feasor exceed the UIM policy limits. Until the [husband] show[s] the

liability insurance proceeds are less than $100,000, there is no UIM available." <u>Id.</u>

---

[9]The insurer in <u>Heitmann</u> had failed to issue its standard UIM limiting endorsement, which
would have limited the UIM coverage to the difference between the UIM policy limits and all
other applicable insurance. The Supreme Court of South Dakota determined that SDCL § 58-11-
9.5 was incorporated into the policy and acted as a limit on the UIM coverage.

Charter Oak argues that Heitmann holds that an underinsured motorist must establish the amount she is entitled to recover from all tortfeasors before she has a viable UIM claim. This interpretation of Heitmann is too broad. The holding in Heitmann was based on the Supreme Court of South Dakota's interpretation of SDCL § 58-11-9.5, which provides:

> Subject to the terms and conditions of such underinsured motorist coverage, the insurance company agrees to pay its own insured for uncompensated damages as its insured may recover on account of bodily injury or death arising out of an automobile accident because the judgment recovered against the owner of the other vehicle exceeds the policy limits thereon. Coverage shall be limited to the underinsured motorist coverage limits on the vehicle of the party recovering less the amount paid by the liability insurer of the party recovered against.

SDCL § 58-11-9.5. Neither Heitmann nor § 58-11-9.5 address the liability of non-motorist potential tortfeasors such as the DOT or a signage company. Instead, Heitmann and § 58-11-9.5 focus on whether UIM coverage is available given the liability insurance limits of the driver and owner of the vehicle that caused the accident. This focus is in keeping with the purpose of UIM coverage, which "is to protect the *insured* party *who is injured* in an automobile accident by the negligence of an uninsured/underinsured motorist." Gloe v. Iowa Mut. Ins. Co., 694 N.W.2d 238, 245 (S.D. 2005). Although the owner of the vehicle involved in the accident in Heitmann was not the driver, this fact does not, as Charter Oak contends, mean that Heitmann requires an insured to establish the amount to be paid by all "non-motorist" tortfeasors. The reason the Court in Heitmann considered the liability limits of the owner of the vehicle is that owners are the one and only tortfeasors specifically mentioned in § 58-11-9.5. Charter Oak's reading of Heitmann, which would require an insured to establish the amount she could recover from all tortfeasors regardless of whether these tortfeasors fell within the purview of § 58-11-9.5 or were one of the tortfeasors UIM coverage is designed to protect against, is unconvincing.

Charter Oak's argument that the Policy required Dziadek to reach a resolution with all tortfeasors fares no better. Without quoting large portions of the UIM endorsement, it is enough to say that Charter Oak's interpretation of the endorsement isolates a few sentences and ignores those provisions showing that Dziadek did not, in fact, have to reach a resolution with all potential tortfeasors to be entitled to UIM benefits. See Def.'s Ex. 1000.

These arguments about other potential tortfeasors fail for another reason. The other potential tortfeasors referenced by Charter Oak—the DOT case defendants—do not appear to have any liability whatsoever for the motor vehicle accident and thus cannot truly be considered tortfeasors at all. If Charter Oak thought otherwise, it likely would have preserved and pursued a claim for contribution or indemnity upon and after paying the $900,000 under UIM coverage.

Charter Oak's final argument in its motion for a new trial is that it was error not to give fourteen of its proposed instructions. Charter Oak has not made any attempt to explain how the absence of these instructions had a probable effect on the jury's verdict. Further, many of the proposed instructions Charter Oak claims this Court should have given either misstated the law or were so slanted in Charter Oak's favor that they were unusable. Charter Oak's motion for a new trial on the contract claim is denied.

### D.      Evidentiary Rulings

Charter Oak contends that it was error to allow "corporate practices evidence and argument" to be introduced to the jury. According to Charter Oak, the corporate practices evidence was inadmissible under Rules 401 and 403 of the Federal Rules of Evidence because Dziadek failed to show a causal connection between the corporate practices and Charter Oak's misconduct. Before trial, Charter Oak moved in limine to prohibit Dziadek from introducing any evidence or argument concerning corporate practices. Doc. 177. This Court granted Charter

Oak's motion in part but held that Dziadek could introduce a limited amount of evidence concerning corporate practices, including evidence of corporate policies of Charter Oak and its claims handler TTIC[10] that were in effect at the time of the claims handling and alleged claim denial, provided that those policies arguably were applied or arguably should have been applied to the handling of Dziadek's claims; evidence of the "scorecards"[11] for Styles and her manager Timothy Westbrook for 2008 through 2012; relevant parts of the TTIC compensation plan for those categories of TTIC representatives involved in handling Dziadek's claim; and performance-management reviews for 2008 through 2012 for Styles, Westbrook, and Brian Koerner, Styles's unit manager. Doc. 262 at 2–3.

Before Dziadek introduced any of the corporate practices evidence at trial, this Court gave the jury a limiting instruction stating that the evidence could only be used to determine whether Charter Oak committed the intentional torts of bad faith, fraud, and deceit, and that the jury should disregard the evidence if they believed the evidence had no effect on Styles and other Charter Oak employees in handling Dziadek's claims. Doc. 313-3 at 14–16. This Court provided the jury with copies of the limiting instruction and informed the jury that the instruction applied to all of the evidence concerning the evaluation and compensation system. Doc. 313-3 at 16. A version of this limiting instruction was included in the final instructions. Doc. 299 at 27.

The corporate practices evidence admitted at trial stayed within the limits set forth in this Court's pretrial order. See Doc. 308. This Court repeatedly sustained Charter Oak's objections

---

[10]TTIC runs Charter Oak and employed Styles and other witnesses who testified for Charter Oak. Charter Oak itself has no employees.

[11]Philip Castagnet, an upper-level supervisor at the Naperville, Illinois office where Styles worked, testified that the scorecards are monthly communications between unit managers and claims adjustors designed to inform claims adjustors "how they're doing in regards to the customer service and quality aspects of their job." Castagnet Dep. at 48. Koerner testified that the scorecards could be used to motivate claim handlers and to keep them informed of the quality of their work. Doc. 313-3 at 43.

when Dziadek's attorney sought to stray beyond those limits.[12]   Some of the corporate practices

evidence admitted suggested that TTIC's evaluation and compensation system encouraged claim

handlers to lower claim payouts.   For instance, Styles's October 2008 scorecard included the

average amount of money paid out on claims and the percentage of cases closed without making

payments.   Pl.'s Ex. 90; Doc. 313-3 at 23.[13]   Castagnet testified that the scorecards were

supposed to be aligned with the objectives of TTIC as a whole.   Castagnet Dep. at 54.   TTIC's

compensation program indicates that one of the company's objectives was to increase earnings

by tying employee compensation to the money employees made, or saved, for TTIC.   TTIC's

compensation planning guide for 2009 to 2010 expressed a philosophy to pay for performance

and results by strengthening the link between compensation, employee contributions, and

bottom-line results.   Pl.'s Ex. 81.

The corporate practices evidence was relevant because the evidence made it more

probable that Styles and others intentionally deceived Dziadek into thinking there was no

coverage under the Policy.   Although Charter Oak contends that Dziadek failed to show a causal

connection between the corporate practices evidence and Charter Oak's misconduct here, this

argument depends on believing Styles's testimony that the scorecards and compensation plan did

not affect how she did her job.   The jury did not find Styles credible and it was entitled to use its

common sense that an evaluation and compensation plan could influence employee decision

---

[12]This Court eventually allowed Dziadek's counsel to ask TTIC employee Richard Ives about
compensation plans in 1998 to 2002 after Ives and other TTIC employees testified repeatedly
that the company did not compensate claim handlers for reducing claim payouts and that doing
so would be bad for business. Ives testified that between 1998 and 2002, bonuses under TTIC's
compensation plan were based in part on the reduction of claim payments. Doc. 313-9 at 124–
35. This Court did not allow the 1998 to 2002 compensation plans into evidence and severely
limited the questioning of Ives about the plans. See Doc. 313-9 at 98–105, 124–35.
[13]Castagnet testified in his deposition that he thought these averages were not unique to Styles
but represented the unit average. Koerner testified that the numbers were unique to Styles,
however.

24

making. Rule 401 is not so exacting that Styles must have admitted that the scorecards and compensation plan influenced her conduct towards Dziadek for the corporate practices evidence to be relevant. Moreover, the corporate practices evidence did not unfairly prejudice Charter Oak. This Court gave multiple limiting instructions and routinely prohibited Dziadek from introducing corporate practices evidence that was remote in time or not specifically connected to Styles and the other TTIC employees involved in handing Dziadek's claim.[14]

Charter Oak argues next that this Court erred by precluding evidence that Cole allegedly committed malpractice by failing to act with the appropriate level of care. This Court before trial ruled preliminarily that the trial would not be an attorney malpractice case against Cole. After all, allowing Charter Oak to try Cole for malpractice would have confused the jury, wasted time, and created a trial within a trial. See Fed. R. Evid. 403. However, this Court ruled in a pretrial order that Charter Oak could offer expert testimony concerning whether the declaration page should have alerted Cole to the UIM coverage for Dziadek and whether it was proper for Cole to rely on Styles's letter. Doc. 262 at 7–8. Charter Oak was allowed to conduct a robust cross-examination of Cole concerning the reasonableness of his investigation of coverage for Dziadek, including questioning Cole about the holdings of South Dakota cases and his familiarity with the South Dakota Division of Insurance's statements on UIM coverage. Doc. 313-7 at 75–131; Doc. 313-8 at 3–41. Indeed, Charter Oak points to no objection to any question its attorney asked

---

[14]Relying on State Farm Mutual Automobile Insurance Co. v. Campbell, 538 U.S. 408 (2003), Charter Oak argues that corporate practices evidence and argument should not have been allowed on Dziadek's punitive damages claim either. The Supreme Court in Campbell explained that evidence on punitive damages should bear a nexus to the harm suffered by the plaintiff. Id. at 422–23. The Court in Campbell reversed a $25,000,000 punitive damages award because the award was based on an insurance company's twenty-year history of out-of-state-conduct bearing no relation to the plaintiffs' harm. Id. at 424. Unlike the trial court in Campbell, this Court limited the corporate practices evidence to the period surrounding Charter Oak's deceit of Dziadek and the people who were involved in handling her claim.

Cole that was sustained by this Court. Charter Oak essentially was allowed to pursue its theory throughout trial and argue that Cole flubbed; no ruling of this Court on this subject was prejudicial to Charter Oak.

### E.    Compensatory Damages

Charter Oak argues in its motion for a new trial and its motion for judgment as a matter of law that Dziadek failed to prove that she was entitled to the $250,000 awarded by the jury for out-of-pocket expenses on the deceit claim. The parties agree that the basis of the $250,000 award was the amount Dziadek would have saved on attorney's fees had Charter Oak not deceived her. Dziadek paid Cole under a fee agreement a third of the $905,000 she received from Charter Oak. Doc. 313-7 at 63. Cole testified that had Charter Oak disclosed the coverage to him back in 2009, he would not have charged Dziadek a third of her recovery. According to Cole, he could have finalized Dziadek's UIM claim in a minimal amount of time in 2009 if he only knew that coverage existed. Doc. 313-7 at 62–63. Cole estimated that he would have charged Dziadek $10,000 for this work rather than a third of her recovery, which he ended up charging after three years of work, including separate lawsuits against Peterson and the DOT case defendants. Doc. 313-7 at 62. During closing arguments, Dziadek's counsel suggested that $250,000 was a conservative estimate of the money Dziadek would have saved in attorney's fees if not for Charter Oak's deceit. Doc. 313-14 at 31. Cole's testimony provides a sufficient basis for the jury's award of the $250,000 compensatory damages on the deceit claim, and Charter Oak is not entitled to a new trial or judgment as a matter of law on this issue.

### F.    Punitive Damages

Charter Oak argues that the jury's $2.75 million award in punitive damages is excessive under South Dakota law and the Due Process Clause of the Fourteenth Amendment.[15]  Unlike compensatory damages, "punitive damages . . . are aimed at deterrence and retribution." State Farm Mut. Auto. Ins. Co., 538 U.S. 408, 416 (2003).  Although "punitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition," BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 568 (1996), "there are procedural and substantive constitutional limitations on these awards," Campbell, 538 U.S. at 416.

The Supreme Court of the United States has established three "guideposts" for courts to consider when reviewing a punitive damages award: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." Campbell, 538 U.S. at 418.  South Dakota law incorporates the following five-factor test within

[15]Although the vast majority of Charter Oak's briefing on punitive damages concern Charter Oak's argument that the damages were excessive, Charter Oak does raise one other issue warranting a short explanation.  At trial, Charter Oak argued that the Supreme Court of South Dakota's decision in Roth v. Farner-Bocken Co., 667 N.W.2d 651 (S.D. 2003) required the following jury instruction: "In order to award punitive damages against Charter Oak, you must find that the conduct you seek to punish reflected a company policy or practice.  The critical factor is the intent of company management, not its employees." Doc. 313-15 at 14.  This Court denied Charter Oak's proposed instruction because Roth did not hold that plaintiffs cannot recover any punitive damages unless they prove a company policy or practice.  Doc. 313-15 at 16-17.  Charter Oak's motion for judgment as matter of law rehashes this issue, arguing that Dziadek is not entitled to punitive damages because she did not show that Charter Oak's misconduct was the result of a company policy.  This argument misstates South Dakota law. Charter Oak also contends in a footnote that even if South Dakota law does not require a plaintiff to prove a company policy or practice, this Court should have instructed the jury that the existence of a policy or procedure should be taken into account.  Charter Oak has not provided any cites to the record showing that it requested such an instruction and has not made any attempt to demonstrate that it was prejudiced by the absence of such an instruction.  Thus, to the extent Charter Oak is arguing for a new trial based on an erroneous jury instruction on punitive damages, this argument is denied.

the Supreme Court's guideposts: "the nature and enormity of the wrong, the intent of the wrongdoer, the wrongdoer's financial condition, and all of the circumstances attendant to the wrongdoer's actions." Roth, 667 N.W.2d at 666.

### i)   Degree of Reprehensibility, Intent of the Wrongdoer, and Nature and Enormity of the Wrong

"[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." Campbell, 538 U.S. at 419 (alteration in original) (quoting Gore, 517 U.S. at 575). When evaluating the reprehensibility of a defendant's conduct, courts consider whether

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

Id.

Charter Oak argues that the first factor militates against finding reprehensibility because Dziadek suffered only economic harm. Although Dziadek's harm was chiefly economic, the evidence at trial showed that Charter Oak caused Dziadek other harm as well. Dziadek's inability to work after the accident made her very anxious about her financial situation; knowing that there was $900,000 of UIM coverage available would have reduced her anxiety. Doc. 313-6 at 41–42. She testified that this anxiety affected her sleep, intensified her pain, and gave her panic attacks. Doc. 313-6 at 41–42, 51. The jury found a link between Charter Oak's misconduct and Dziadek's anxiety as it awarded Dziadek emotional distress damages on her deceit claim. The Eighth Circuit has suggested that similar evidence can support a finding that a defendant's conduct was reprehensible. See Moore v. Am. Fam. Mut. Ins. Co., 576 F.3d 781,

28

790 (8th Cir. 2009) ("We first observe that [the plaintiffs'] injuries were not limited to financial losses. As we have said, the evidence showed that they suffered emotional distress, and [the husband] suffered from chest pain, was unable to sleep, and began to smoke more because he was accused of being an arsonist."). Because Dziadek suffered emotional and mental harm in addition to her economic harm, the first factor militates slightly in favor of finding that Charter Oak's conduct was reprehensible.

The next factor—indifference to or a reckless disregard of the health or safety of others— also weighs slightly in favor of finding reprehensibility. Styles was the agent acting for Charter Oak in deceiving Dziadek into believing there to be no coverage for her under the Policy in 2009. When Styles deceived Cole and Dziadek, Styles knew that Dziadek had been seriously injured and that she needed someone nearby at all times because she was at risk of choking or falling. Def.'s Ex. 1034. Styles knew that Dziadek's injury was so severe that she needed her sister to communicate for her. Def.'s Ex. 1034. Although Styles's decision to deceive Dziadek despite knowing her situation might not constitute indifference to the health or safety of others besides Dziadek, Styles's conduct was indifferent or reckless in disregard of Dziadek's health or safety.

The third factor, financial vulnerability, weighs more heavily in favor of finding reprehensibility. Styles was aware that Dziadek could not work because of the severity of her injuries and that she might never work again. Def.'s Ex. 2034. Styles knew that Dziadek had only $100,000 of liability coverage through Progressive, yet had medical expenses exceeding $100,000. Def.'s Ex. 1034.

The fourth factor concerns whether Charter Oak's misconduct was an isolated incident or involved repeated actions. Dziadek argues that Charter Oak's repeated misconduct against her

shows reprehensibility.   Although the "repeated actions" factor "will necessarily have 'less force' where the defendant's misconduct did not extend beyond [its] dealings with the plaintiff, it may still be 'relevant' in measuring the reprehensibility of the defendant's conduct, based on the particular facts and circumstances presented." CGB Occupational Therapy, Inc. v. RHA Health Servs., Inc., 499 F.3d 184, 191 (3d Cir. 2007) (internal citations omitted) (quoting Willow Inn, Inc. v. Pub. Serv. Mut. Ins. Co., 399 F.3d 224, 232–33 (3d Cir. 2005)).   The evidence supports finding that Charter Oak engaged in repeated misconduct against Dziadek.   Despite the fact that Dziadek qualified as an insured under the Policy's UIM provision, Styles in 2009 told Cole there was no coverage for Dziadek orally and then in writing.   She then further misled Cole by withholding the UIM provision and sending him the part of the policy under which Dziadek was not covered or defined as an insured.   Even two years later in 2011, Styles withheld the Policy from Dziadek's counsel by asserting that it was some 2,000 pages, when it was about 200 pages. She delayed sending the UIM policy provisions in 2011 when they were specifically requested. After the UIM policy provisions finally were sent, Charter Oak did not respond to the letter from Dziadek's counsel seeking to confirm that Dziadek in fact was covered.   Charter Oak only admitted to coverage after being sued and never paid interest on the amount admittedly owed Dziadek.   The jury trial revealed that Charter Oak blamed Cole and did not accept responsibility for having done anything wrong during the litigation.   Although Charter Oak's tone began to change at trial, and changed dramatically in the punitive damages phase of trial, Doc. 313-15 at 52–54, by then many years had passed of Charter Oak evading payment of the full amount of UIM benefits with interest owed.   Under these facts, the fourth factor weighs moderately in favor of finding reprehensibility.

The fifth factor militates strongly in favor of reprehensibility because the jury found that Charter Oak engaged in deceit and the evidence supports this finding.

The two South Dakota factors relating to reprehensibility are the defendant's intent and the enormity of the wrong. As noted already, the jury found that Charter Oak intentionally deceived Dziadek about the existence of UIM coverage. Charter Oak contends that Styles's conduct is of "limited offensiveness" because Dziadek did not introduce evidence that the conduct was part of a company policy or practice. See Pulla v. Amoco Oil Co., 72 F.3d 648, 660–61 (8th Cir. 1995) (concluding that damages were excessive based in part on the lack of any evidence that the misconduct reflected a company policy or practice); Roth, 667 N.W.2d at 666–667 (same). Charter Oak is incorrect. Dziadek introduced evidence suggesting that the compensation and evaluation systems encouraged claim handlers for Charter Oak to save the company money by reducing claim payouts. There was no evidence that claim handlers were told to deceive insureds, but the compensation and evaluation system provides the only reasonable explanation for why Styles intentionally misled Cole and Dziadek about the UIM coverage. It beggars belief that Styles, who had never met Cole or Dziadek, would intentionally deceive them about the existence of coverage if she did not have some motive for doing so. Charter Oak's conduct in this case warrants punitive damages. See Exxon Shipping Co. v. Baker, 554 U.S. 471, 494 (2008) ("Action taken or omitted in order to augment profit represents an enhanced degree of punishable culpability . . . ."). For the reasons discussed above, the "reprehensibility" guidepost weighs in favor of upholding the punitive damages award.

ii)    **The Difference between the Actual or Potential Harm Suffered by Dziadek and the Punitive Damages Award**

31

Under the second guidepost, "[t]he amount of punitive damages must bear a reasonable relationship to the compensatory damages." Roth, 667 N.W.2d at 667 (quoting Grynberg, 573 N.W.2d at 504). The Supreme Court has "been reluctant to identify concrete constitutional limits on the ratio between harm . . . and the punitive damages award," but has stated that "[s]ingle digit multipliers are more likely to comport with due process." Campbell, 538 U.S. at 424–25. Here, Dziadek received $250,000 for out-of-pocket expenses and $500,000 for emotional harm and distress. As explained later, Dziadek cannot recover the $500,000 for emotional harm on a deceit claim under South Dakota law. This does not mean, however, that that $250,000 in out-of-pocket expenses is the only amount this Court can consider when comparing Dziadek's harm to the punitive damages award. Dziadek was awarded interest on the $900,000 as part of her compensatory damages. Further, when, as here, a state's prejudgment interest statute is designed to compensate the injured party, S.D. Bldg. Auth. v. Geiger-Berger Assocs., 414 N.W.2d 15, 19 (S.D. 1987), courts consider prejudgment interest as part of the compensatory damages when calculating the ratio between the plaintiff's harm and the punitive damages, USA Commercial Mortg. Co. v. Compass USA SPE LLC (In re USA Commercial Mortg. Co.), 802 F. Supp. 2d 1147, 1188–89 (D. Nev. 2011). As explained in more detail below, Dziadek is entitled to $387,511.70 in interest. The $250,000 in out-of-pocket expenses and the $387,511.70 in interest amount to a total award of $637,511.70. That makes the ratio of punitive to compensatory damages 4.3 to 1. This ratio is well within the Supreme Court's single digit rule and therefore weighs in favor of upholding the jury's punitive damages award.

> **iii)   Difference Between the Punitive Damages and the Civil Penalties Authorized or Imposed in Comparable Cases and Charter Oak's Financial Condition**

Charter Oak does not argue that the punitive damages award is excessive or improper under the Supreme Court's third guidepost. South Dakota law has added a consideration of the "wrongdoer's financial condition" as a factor in evaluating a punitive damages award. Roth, 667 N.W.2d at 665. "Punitive damages must be relatively large to accomplish the objective of punishing the wrongdoer and deterring others from similar wrong." Engles v. Ranger Bar, Inc., 604 N.W.2d 241, 247 (S.D. 2000). Still, "the purpose of punitive damages is to punish, not to permanently cripple or destroy." Grynberg, 573 N.W.2d at 507–08. Charter Oak's net worth in 2012 was over $232 million dollars. Pl.'s Ex. 299. The $2.75 million punitive damages award is approximately 1.2% of Charter Oak's net worth. There is no concern that the punitive damage award will cripple or destroy Charter Oak.

## III. Issues Raised in Preliminary Verdict.

### A.    Emotional Distress Damages.

After trial, this Court invited briefing on "whether a deceit claim can support an award for 'mental and emotional harm.'" Doc. 311 at 2. Charter Oak's motion for judgment as a matter of law challenged the damages award on the deceit claim as well. The parties filed lengthy briefs on this issue. Yet resolution of this issue still turns on the two most relevant South Dakota cases—Fix v. First State Bank of Roscoe, 807 N.W.2d 612 (S.D. 2011) and Stabler v. First State Bank of Roscoe, 865 N.W.2d 466 (S.D. 2015)—which were discussed at trial on the issue of whether Dziadek can recover emotional distress damages on her deceit claim.[16]

---

[16]At the time of trial, the discussion concerned possible recovery of emotional distress damages not only on deceit, but also the fraud claim. Emotional distress damages are recoverable on an insurance bad faith claim under South Dakota law, so the Court to avoid a duplicate recovery had a separate line on the verdict form for the jury to complete concerning non-economic damages if it were to find for Dziadek on any of her tort claims. The only tort claim on which the jury found for Dziadek was the deceit claim.

The Supreme Court of South Dakota in <u>Fix</u> held that a plaintiff bringing an abuse-of-process claim is not required to prove the elements of intentional or negligent infliction of emotional distress to recover emotional distress damages.  <u>Id.</u> at 807 N.W.2d at 616–17.  In reaching this conclusion, the Supreme Court of South Dakota distinguished <u>Maryott v. First National Bank of Eden</u>, 624 N.W.2d 96 (S.D. 2001), in which it held that a plaintiff suing a bank under a South Dakota statute for wrongfully dishonoring checks could not recover for emotional distress damages unless the plaintiff satisfied the elements of negligent or intentional infliction of emotional distress.  <u>Id.</u> at 616.  The issue in <u>Maryott</u> was whether emotional damages constituted "other consequential damages" under the statute making banks liable for wrongfully dishonoring checks.  <u>Id.</u>  <u>Maryott</u> was distinguishable, the Court in <u>Fix</u> held, because it was not a tort action governed by SDCL § 21-3-1.  <u>Id.</u> at 616–17.

Section 21-3-1, which is South Dakota's general statute on tort damages, provides: "For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not."  SDCL § 21-3-1.  The Court in <u>Fix</u> emphasized the use of the word "all" in § 21-3-1 before stating that it had "consistently recognized emotional distress damages in tort actions."  <u>Fix</u>, 807 N.W.2d at 617 (citing <u>Roth</u>, 667 N.W.2d at 670 (upholding damages for emotional distress in invasion of privacy case); <u>Carey v. Jack Rabbit Lines, Inc.</u>, 309 N.W.2d 824, 827 (S.D. 1981) (upholding award of damages for pain and suffering in negligence action because in addition to the plaintiff's physical injury, the plaintiff suffered "mental anguish"); <u>Bean v. Best</u>, 93 N.W.2d 403, 408 (S.D. 1958) (stating in a false imprisonment case that a "person who has a cause of action for a tort may be entitled to recover as an element of damages for that form of mental distress

known as humiliation, that is, a feeling of degradation or inferiority") (quotation omitted); Davis v. Holy Terror Mining Co., 107 N.W. 374, 379 (S.D. 1906) (stating that in determining damages in a negligence case, "the jury should take into consideration the age and condition in life of the plaintiff, the physical injury inflicted, the bodily pain and mental anguish endured")). "Since an abuse of process claim is an intentional tort," the Court explained, "a plaintiff can seek damages in the form of emotional distress without proving the independent tort of intentional infliction of emotional distress." Fix, 807 N.W.2d at 617.

Fewer than four years after deciding Fix, the Supreme Court of South Dakota in Stabler considered whether plaintiffs asserting fraud can recover emotional distress damages. Stabler, 865 N.W.2d at 479. Deceit—the claim on which the jury awarded Dziadek emotional distress damages—is a "species of fraud" in South Dakota. Rist v. Karlen, 241 N.W.2d 717, 719 n.* (S.D. 1976); see also Stockmen's Livestock Mkt., Inc. v. Norwest Bank of Sioux City, 135 F.3d 1236, 1243 (8th Cir. 1998) (equating common law fraud and statutory deceit under South Dakota law). The Court in Stabler stated that it had never held that plaintiffs can recover emotional distress damages under a fraud claim. Stabler, 865 N.W.2d at 479. Although the Court acknowledged its statement in Fix that it had "consistently recognized emotional distress damages in tort actions," the Court in Stabler did not hold that Fix or the cases cited therein established that a plaintiff in a fraud case can recover emotional distress damages without any special showing. Id. Instead, the Court in Stabler noted that some courts allow emotional distress damages in fraud actions while others do not. Id. (Comparing Walsh v. Ingersoll-Rand Co., 656 F.2d 367, 370 (8th Cir. 1981) ("[T]he general rule is that fraud is an economic tort and thus protects only pecuniary loses."), with Hoffman v. Stamper, 867 A.2d 276, 297–98 (Md. 2005) (collecting cases and stating "[t]here clearly is no universal view")). The Court concluded

35

by holding that because the plaintiff in <u>Stabler</u> had failed to offer evidence or make an offer of proof to support a claim for intentional or negligent infliction of emotional distress, the trial court did not err by denying emotional distress damages. <u>Id.</u>

The <u>Stabler</u> decision establishes that a plaintiff in a fraud or deceit case under South Dakota law must satisfy the elements of intentional or negligent infliction of emotional distress to recover emotional distress damages. After all, the Supreme Court of South Dakota in <u>Stabler</u> held that the plaintiffs were not entitled to emotional distress damages because they had failed to prove up either "intentional or negligent infliction of emotional distress." <u>Id.</u>   It follows from this holding that plaintiffs asserting a fraud or deceit claim under South Dakota law must, in fact, prove the elements of intentional or negligent infliction of emotional distress to recover emotional distress damages. Were it otherwise, the Supreme Court of South Dakota's holding in <u>Stabler</u> would make little sense. That is, if the Court in <u>Stabler</u> had concluded that the plaintiffs could recover emotional distress damages on a fraud or deceit claim without proving one of the emotional distress torts, or if the Court had merely left the question open, the plaintiffs' failure to offer evidence proving intentional or negligent infliction of emotional distress would not preclude them from recovering emotional distress damages.

The requirement in <u>Stabler</u> that plaintiffs in fraud cases prove one of the emotional distress torts to recover emotional distress damages is consistent with the general rule that damages for fraud are limited to the plaintiff's pecuniary loss.[17]   <u>See</u> <u>Walsh</u> 656 F.2d at 370;

---

[17]There are, of course, exceptions to this general rule, including when a plaintiff is able to satisfy the elements of intentional or negligent infliction of emotional distress. <u>Karas</u>, 33 F.3d at 999; <u>see also</u> Steven J. Gaynor, Annotation, <u>Fraud actions: Right to Recover for Emotional Distress</u>, 11 A.L.R. 5th 88 (published in 1993 but updated weekly) (noting that general rule is not absolute and describing circumstances under which courts have allowed plaintiffs to recover emotional distress damages in fraud cases).

Steven J. Gaynor, Annotation, <u>Fraud actions: right to recover for emotional distress</u>, 11 A.L.R.

5th 88 (published in 1993 but updated weekly).  The Eighth Circuit explained the basis for the

general rule in <u>Karas</u>:

> Fraud, deceit and negligent misrepresentation are economic torts.
> Although the invasion of an economic interest by tort or by
> contract breach will often cause the plaintiff personal distress, the
> interest ordinarily protected in such cases is purely an economic
> interest and does not include interests in personality.  Accordingly,
> the usual rule is that the plaintiff must show pecuniary loss in
> misrepresentation cases and the damages are limited to such
> pecuniary loss, with no recovery for emotional distress.

<u>Id.</u> 33 F.3d at 999 (quoting Dan B. Dobbs, <u>Dobbs Law of Remedies</u> § 9.1(4) at 559–60 (2d ed.

1993)).  The view that economic torts should be distinguished from torts protecting interests in

personality, which are sometimes called "dignitary torts," helps to reconcile the Supreme Court

of South Dakota's decisions in <u>Fix</u> and <u>Stabler</u>.  <u>Fix</u> involved an abuse-of-process claim, a

dignitary tort.  Dan B. Dobbs et al., <u>Dobbs' Law of Torts</u> § 514 (2d ed. updated June 2016).  The

cases the Supreme Court of South Dakota cited in <u>Fix</u> when stating that it had "consistently

recognized emotional distress damages in tort actions" involved either dignitary torts or

negligence actions in which the plaintiff suffered bodily injury.  807 N.W.2d at 617; <u>see</u> Dobbs,

<u>Dobbs Law of Remedies</u> § 7.1(1) (listing false imprisonment and invasion of privacy as dignitary

torts).  Emotional distress is usually considered an ordinary part of damages in cases involving

dignitary torts or negligence causing bodily injury.  Dobbs, <u>Dobbs Law of Remedies</u> § 7.3(2), at

308–09 (emotional distress damages for dignitary torts); <u>id.</u> § 8.1(4), at 384–85 (emotional

distress damages for bodily injury).  Thus, under the general rule, it made sense for the Supreme

Court of South Dakota to hold that the plaintiffs in <u>Fix</u> and the cases cited therein could recover

emotional distress damages without any additional showing but that the plaintiffs in Stabler, who were asserting an economic tort, could not.[18]

Dziadek makes three main arguments for why she is entitled to emotional distress damages on her deceit claim. None of these arguments are persuasive. Dziadek argues first that the South Dakota code allows her to recover for emotional distress without making any special showing. Specifically, she points to SDCL § 21-3-1, which is the general statute on tort damages quoted above, and SDCL § 20-10-1, which provides that "[o]ne who willfully deceives another, with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers." Dziadek contends that the words "all . . . detriment" in § 21-3-1 and "any damage" in § 20-10-1 include damages for emotional distress.

The role of a federal court sitting in diversity jurisdiction is to interpret state law, not fashion it or overrule decisions from the state's highest court. Karas, 33 F.3d at 1000 ("As a federal court, our role is to interpret state law in diversity cases and not to fashion it."); Quint v. A.E. Staley Mfg. Co., 172 F.3d 1, 17 (1st Cir. 1999) ("Unlike a state court, the federal courts, in diversity cases, are not free to overrule existing state precedent or chart the future course of state law in such manner as we may see fit.") (citation omitted). In Stabler, the Supreme Court of South Dakota acknowledged Fix's holding based on SDCL § 21-3-1 and quoted SDCL § 20-10-1. 865 N.W.2d at 476 & n.16. Despite being expressly aware of Fix and both § 20-10-1 and § 21-3-1, the Supreme Court of South Dakota in Stabler did not hold that the South Dakota code

---

[18]The parties hotly dispute whether the Supreme Court of South Dakota has adopted what they refer to as the "economic tort doctrine," that is, the general rule that damages in economic tort cases are limited to pecuniary loss. This Court is not holding that the Supreme Court of South Dakota has adopted the economic tort doctrine and discusses the doctrine only because it is one way of harmonizing Fix with Stabler. Stabler is the most recent, and apparently the only South Dakota case addressing the recovery of emotional distress damages in a fraud action. This Court thus must follow Stabler in this diversity jurisdiction case regardless of the Supreme Court of South Dakota's basis for deciding the case the way it did.

allows recovery for emotional distress on a fraud or deceit claim without any special showing. Instead, the Court in Stabler held that the plaintiffs were not entitled to emotional distress damages in a fraud claim because they had not proved either emotional distress torts. Id. at 479. This Court declines Dziadek's invitation to reinterpret South Dakota law to reach a conclusion that the Supreme Court of South Dakota could have, but did not, reach in Stabler.

Dziadek next argues that Fix established a general rule that emotional distress is an ordinary part of damages for all intentional torts, including deceit. She contends that Stabler should be interpreted as merely confirming that plaintiffs can recover emotional distress damages for deceit claims. Dziadek's argument ignores the language of Stabler and treats Fix as if it overruled Stabler. True, the Supreme Court of South Dakota in Fix stated that because abuse of process is an intentional tort, the plaintiff need not make any special showing to recover emotional distress damages. 807 N.W.2d at 617. But just four years later in Stabler, the Court stated that it had never held that emotional distress damages could be recovered through a fraud claim, another intentional tort. Id. at 479. The Supreme Court of South Dakota also held that the plaintiffs in Stabler were not entitled to emotional distress damages because they had failed to prove either emotional distress torts. Id. Stabler is both the more recent and more applicable case to Dziadek's deceit claims, and the earlier Fix case does not justify ignoring Stabler.[19]

Dziadek's third argument is that regardless of the law in South Dakota on emotional distress damages, she proved the elements of negligent infliction of emotional distress as well as the other requirements Charter Oak argues she must prove. But Dziadek never pleaded a claim for negligent infliction of emotional distress, and this Court accordingly neither instructed on nor

---

[19]Dziadek also cites a number of older South Dakota cases, some dating back to the early twentieth century, which she says support her interpretation of Fix. However, none of these cases hold that emotional distress damages are recoverable in a fraud or deceit action without any special showing.

submitted such a claim to the jury. A plaintiff must prove four elements to recover for negligent infliction of emotional distress: (1) the defendant was negligent; (2) the plaintiff suffered emotional distress; (3) the defendant's negligence legally caused the emotional distress; and (4) the plaintiff suffered a physical manifestation of the distress. Blaha v. Stuard, 640 N.W.2d 85, 90 (S.D. 2002); Maryott, 624 N.W.2d at 104; Nelson v. WEB Water Dev. Ass'n, 507 N.W.2d 691, 699 (S.D. 1993).

The final instruction on damages in this case did not contain all of the elements of negligent infliction of emotional distress, but read instead:

> If you decide for Dziadek on the question of liability on her claim for bad faith or her claim for fraud or deceit, you must then fix the amount of money which will reasonably and fairly compensate Dziadek for any of the following elements of loss or harm proved by the evidence to have been legally caused by Charter Oak's conduct, whether such loss or harm could have been anticipated or not, namely:
>
> (1)    Any out-of-pocket expenses Dziadek incurred as a result of Charter Oak's conduct, including reasonable attorney's fees and costs; and
>
> (2)    Any other harm Dziadek experienced as a result of Charter Oak's conduct, including mental and emotional harm.
>
> To recover damages for mental and emotional harm, Dziadek must establish that she sustained a pecuniary loss because of the bad faith of the insured. "Pecuniary loss" means loss of money or something having monetary value.
>
> Whether any of these elements of damages have been proved by the evidence is for you to determine. Your verdict must be based on evidence and not upon speculation, guesswork, or conjecture.

Doc. 299 at 28.

When discussing this instruction with the parties, this Court explained:

> South Dakota law does not appear yet to recognize emotional distress as an element of damages from a fraud claim or, I believe,

> a deceit claim, although it does seem to recognize emotional
> distress as an element of damages in an insurance bad faith claim.
> So that's why there is a separate line on the verdict form for that,
> because there might be an issue. If the jury were to find for the
> Defendant on bad faith and yet for the Plaintiff on fraud and deceit,
> it could be an issue as to recovery of that.

Doc. 313-13 at 22. Despite this Court's statement expressing skepticism about the availability of

emotional distress damages on a deceit claim, Dziadek did not object to the final instruction on

damages, propose a different instruction on damages, or request instructions on negligent

infliction of emotional distress. Because Dziadek neither plead negligent infliction of emotional

distress nor tried that claim to the jury, she is not entitled to recover damages for emotional

distress on the deceit claim.

## B.    Interest.

The jury awarded Dziadek prejudgment interest on the $900,000 of UIM coverage

beginning on December 15, 2009, as damages on both the breach of contract for UIM benefits

claim and the deceit claim, plus an additional $250,000 for out-of-pocket expenses on the deceit

claim. After trial, this Court invited briefing on "whether a 10% interest rate or some different

rate applies to calculate prejudgment interest." Doc. 311 at 1. Dziadek submitted a brief

contending (1) that there is a 15% interest rate on the $900,000 from December 15, 2009 through

February 22, 2012; (2) that there is a 10% interest rate on compensatory damages from February

22, 2012 through May 31, 2016; (3) that she is entitled to prejudgment interest on the $250,000

out-of-pocket expenses running from February 29, 2012 (when Cole distributed the settlement

funds) to May 31, 2016; and 4) that she is entitled to prejudgment interest on the $100,000 she

ultimately collected from Progressive for Peterson's liability limits. Charter Oak argues that

prejudgment interest only applies to the amount Dziadek could have received on December 15,

2009, and that the $900,000 must therefore be reduced accordingly; disagrees with the interest

41

rate Dziadek applies for the time period of December 15, 2009 through the date of the jury's verdict; and argues that Dziadek is not entitled to prejudgment interest on the $250,000 out-of-pocket expenses or the $100,000 she collected from Progressive.

### i)   Money on Which Dziadek Can Recover Interest.

This Court rejects Charter Oak's unsupported assertion that Dziadek cannot recover interest on the full $900,000 Charter Oak owed under the policy. Charter Oak had the benefit of the entire $900,000 regardless of whether Dziadek ultimately owed some of the money to others. This Court also concludes that Dziadek may recover interest on the $250,000 in out-of-pocket expenses. Although Charter Oak argues that allowing interest on the $900,000 and the $250,000 amounts to double counting, the interest on the two amounts was not accruing at the same time. Dziadek is not entitled to interest on $100,000 she collected from Progressive, however, based on the jury verdict.

### ii)   The Interest Rate on the $900,000 from December 15, 2009 through February 21, 2012 is 10%.

Charter Oak argues that the interest rate for the $900,000 is 10% under SDCL § 21-1-13.1. Section 21-1-13.1 provides that "[a]ny person who is entitled to recover damages . . . is entitled to recover interest thereon from the day that the loss or damage occurred . . . Prejudgment interest on damages arising from a contract shall be at the contract rate, if so provided in the contract; otherwise, if prejudgment interest is awarded, it shall be at the Category B rate of interest specified in § 54-3-16." SDCL § 21-1-13.1. The specified Category B rate is 10% per year. SDCL § 54-3-16.

Dziadek disagrees, arguing that the interest rate is 15% under SDCL § 54-3-5. Section 54-3-5 reads:

**Interest on moneys after they become due—Express contracts excepted**

> Unless there is an express contract in writing fixing a different rate or the interest rate clearly appears on the bill, statement, or invoice, interest is payable on all moneys at the Category F rate of interest as established in § 54-3-16 after they become due on any instrument of writing, and on moneys lent, or due on any settlement of accounts, from the day on which the balance is ascertained, and on moneys received to the use of another and detained from that other. Any interest rate appearing on a bill, statement, or invoice may not exceed eighteen percent.

S.D.C.L. § 54-3-5. The specified Category F interest rate is 15% per year. SDCL § 54-3-16.

In 1993, the Supreme Court of South Dakota held that the interest rate set forth in § 54-3-5 applied to the $100,000 the plaintiff recovered in a declaratory judgment action against her insurer. Kremer v. Am. Family Mut. Ins., 501 N.W.2d 765, 771 (S.D. 1993). The plaintiff in Kremer sued her insurance company for uninsured motorist benefits under her policy. The trial court found that she was entitled to uninsured motorist benefits and applied the 15% interest rate in § 54-3-5. The Supreme Court of South Dakota affirmed, reasoning: "This is a declaratory action brought to determine the rights and duties of the parties under an insurance contract, which is an 'instrument of writing.' Therefore, SDCL 54-3-5, which applies in part to interest due 'on any instrument of writing,' is controlling. The 15% interest rate is correct." Kremer, 501 N.W.2d at 771.

Less than a year later, however, the Supreme Court of South Dakota held that SDCL § 21-1-13.1, rather than SDCL § 54-3-5, governs the calculation of interest in contract actions. U.S. Lumber, Inc. v. Fisher, 523 N.W.2d 87, 90 (S.D. 1994). The Court in Fisher explained:

> Although SDCL 54–3–5 has been used to award prejudgment interest, the language is not specific to such ends. On the other hand, SDCL 21–1–13.1 is very specific on awarding prejudgment interest in contract actions. It is well-established that terms of a statute relating to a particular subject will prevail over general terms of another statute. Nelson v. School Bd. of Hill City, 459

N.W.2d 451, 454 (S.D.1990); *Meyerink v. Northwestern Pub. Serv. Co.,* 391 N.W.2d 180, 184 (S.D.1986). As such, SDCL 21–1–13.1 prevails here.

Additionally, due to the potential applicability of either statute, SDCL 21–1–13.1 controls because it is the more recent enactment. *In re Estate of Smith,* 401 N.W.2d 736, 740 (S.D.1987); *Kneip v. Herseth,* 87 S.D. 642, 214 N.W.2d 93 (1974).

Fisher, 523 N.W.2d at 91.

Although the Court in Fisher did not discuss Kremer, there is an explanation for the difference between the two cases: Section 21-1-13.1 did not apply in Kremer because Kremer was filed before the statute came into effect. See SDCL § 21-1-13.2 ("The provisions of § 21-1-13.1 apply to any suit commenced on or after July 1, 1990. The provisions of §§ 21-1-11 and 21-1-13 apply to any suit commenced before July 1, 1990."); Kremer, 501 N.W.2d at 767 (stating that the plaintiff filed the case on March 20, 1990). When the Supreme Court of South Dakota had the opportunity in Fisher to apply the more specific and recent § 21-1-13.1, it did so. Fisher, 523 N.W.2d at 91. Since Fisher, the Supreme Court of South Dakota has consistently applied § 21-1-13.1 in contract cases. See Casper Lodging, LLC v. Akers, 871 N.W.2d 477, 499 (S.D. 2015) (quoting SDCL § 21-1-13.1 when discussing prejudgment interest in case involving breach of construction contract), abrogated on other grounds by Magner v. Brinkman, 883 N.W.2d 74, 80–81 (S.D. 2016); Dakota, Minn. & E. R.R. v. Acuity, 720 N.W.2d 655, 663 (S.D. 2006) (relying on § 21-1-13.1 when determining the date on which prejudgment interest began to run in insurance contract case); Bunkers v. Jacobson, 653 N.W.2d 732, 744 (S.D. 2002) (selecting § 21-1-13.1 as the governing statute where parties in contract action argued that they were entitled to prejudgment interest under § 21-1-13.1 or § 54-3-5). Fisher and the decisions coming after it make clear that § 21-1-13.1 and the 10% interest rate set forth therein apply when calculating prejudgment interest.

44

Dziadek argues that § 21-1-13.1 should not apply because the jury awarded interest on the $900,000 as part of the compensatory damages. According to Dziadek, prejudgment interest under § 21-1-13.1 is interest on compensatory damages while interest under § 54-3-5 is part of the damages. Dziadek does not cite any authority to support this distinction between § 21-1-13.1 and § 54-3-5, and this Court has found none. Moreover, it makes sense to apply § 21-1-13.1 to calculate part of Dziadek's compensatory damages because the very purpose of prejudgment interest is to "compensate the injured party for [the wrongful] detention of money owed." Geiger-Berger Assocs., 414 N.W.2d at 19.

The parties disagree about when the period for calculating interest on the $900,000 should end. Charter Oak contends that the period should end on February 16, 2012, which Charter Oak misidentifies as the date it paid the UIM benefits to Dziadek. Charter Oak actually sent the check for UIM benefits to Dziadek on February 21, 2012. Doc. 128-25 at 2. Dziadek argues that the period should begin the day after Charter Oak sent the check. This Court finds that February 21, 2012, is the appropriate end date for calculating prejudgment interest on the $900,000.

### iii. The Interest Rate is 10% for the period of February 21, 2012 through May 27, 2016.

The parties agree that there is a 10% interest rate for the period beginning after Charter Oak paid Dziadek the UIM benefits. They disagree, however, about whether the interest should run to the date of the jury's verdict, May 27, 2016, or to the date this Court entered a preliminary judgment, May 31, 2016. Section 21-3-13.1 settles this dispute, providing in relevant part: "If there is a question of fact as to when the loss or damage occurred, prejudgment interest shall commence on the date specified in the verdict or decision and shall run to, and include, the date

of the verdict or, if there is no verdict, the date the judgment is entered." SDCL § 21-1-13.1.
Thus, under § 21-1-13.1, the interest runs from February 21, 2012 through the date of the verdict,
which is May 27, 2016.

### iv.   A 10% Interest Rate Applies to the $250,000.

Dziadek agrees that the 10% prejudgment interest rate in § 21-1-13.1 applies to the
$250,000 in out-of-pocket expenses. The interest on the $250,000 runs from February 29, 2012,
which is the day Cole was paid one third of the settlement in attorney's fees, to May 27, 2016.
Pl.'s Ex. 303. Charter Oak's only argument to the contrary is that this is double-counting interest
on the $900,000 of UIM benefits, but it is not because calculation of prejudgment interest on the
full $900,000 ends on February 21, 2012. Charter Oak then owes prejudgment interest on the
lesser amount of accrued interest from February 21, 2012, and on the $250,000 of compensatory
damages from February 29, 2012.

### v.   Dziadek is entitled to $387,511.70 in interest.

Dziadek is entitled to $197,100.00 in interest for the period running from December 15,
2009 to February 21, 2012. The $197,100.00 amount represents 10% interest on $900,000 for
799 days, which is the number of days between December 15, 2009 and February 21, 2012.
Dziadek is entitled to $84,161.70 in prejudgment interest for the period running from February
21, 2012 to May 27, 2016. The $84,161.70 amount represents 10% interest on $197,100.00 for
1,558 days, which is the number of days between February 21, 2012 and May 27, 2016. Dziadek
is entitled to $106,250.00 in prejudgment interest on the $250,000 for the period running from
February 29, 2012 to May 27, 2016. The $106,250.00 represents 10% interest on $250,000 for
1,550 days, which is the number of days between February 29, 2012 and May 27, 2016. Taken

together, $197,100.00, $84,161.70, and $106,250.00 add up to $387,511.70 in prejudgment interest owed to Dziadek.

### C.   Declaratory Judgment Claims.

Dziadek in her amended complaint asserted that she is entitled to declarations that she is an insured under the UIM coverage and thus that Charter Oak owed her a duty of good faith and fair dealing (Count 1), that $1,000,000 of UIM coverage exists (Count 2), and that she is an insured under the medical payments coverage (Count 3). Doc. 15 at ¶¶ 15–51. After Dziadek filed her amended complaint but before this Court issued any ruling on the merits, Charter Oak paid Dziadek the UIM and medical payments benefits she sought, Doc. 128-25 at 2, and admitted the key paragraphs of Counts 1, 2, and 3, Doc. 1 at ¶¶ 24, 36, 51; Doc. 8 at ¶¶ 24, 36, 51; Doc. 15 at ¶¶ 24, 36, 51; Doc. 16 at ¶¶ 24, 36, 51. Charter Oak argues that Dziadek's declaratory judgment claims are moot under these circumstances.

"A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—'when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.'" Already, L.L.C. v. Nike, Inc., 133 S. Ct. 721, 726–27 (2013) (quoting Murphy v. Hunt, 455 U.S. 478, 481 (1982) (per curiam)). "This case-or-controversy requirement subsists through all stages of federal judicial proceedings, trial and appellate." Lewis v. Cont'l Bank Corp., 494 U.S. 472, 477 (1990). In rejecting Charter Oak's argument on summary judgment that Dziadek's declaratory judgment claims were moot, this Court concluded that although there appeared to be little "live" controversy surrounding the declaratory judgment claims, the declaratory judgment claims could potentially affect Dziadek's other claims that remained unresolved. Doc. 153 at 9. Now that the jury has rendered a verdict,

there is little justification for finding that Dziadek's declaratory judgment claims present a case or controversy.

The only cognizable interest in the declaratory judgment claims Dziadek has identified is her ability to recover costs and attorney's fees. Doc. 331 at 2. A request for costs, however, "is not sufficient to keep the case alive." T.W. v. Spokane Cty., 385 F. App'x 706, 708 (9th Cir. 2010); 13C Charles Alan Wright et al., Federal Practice and Procedure § 3533.3 (3d ed.) ("Claims for costs traditionally have not been thought sufficient to avoid mootness . . . ."). Similarly, "a claim for attorneys' fees is generally not sufficient to save a case from being moot." Neighborhood Transp. Network, Inc. v. Pena, 42 F.3d 1169, 1172 n.2 (8th Cir. 1994). Because Dziadek's declaratory judgment claims no longer present a live case or controversy, they are moot. However, this Court retains equitable jurisdiction over the attorney's fees and costs issues in the event that either of those issues requires resolution. See Zucker v. Occidental Petroleum Corp., 192 F.3d 1323, 1329 (9th Cir. 1999) ("No Article III case or controversy is needed with regard to attorneys' fees . . . because they are but an ancillary matter over which the district court retains equitable jurisdiction even when the underlying case is moot.").

## IV. Conclusion

For the reasons explained above, it is

ORDERED that Charter Oak's Motion for Judgment as a Matter of Law, Doc. 317, is granted only as to the $500,000 jury award for mental and emotional harm, and is otherwise denied. It is further

ORDERED that Charter Oak's Motion for New Trial, Doc. 318, is denied. It is further

ORDERED that Dziadek's three declaratory judgment claims are dismissed as moot. It is finally

ORDERED that final judgment will enter for $250,000 of compensatory damages, $387,511.70 in interest through May 27, 2016, and $2.75 million of punitive damages for Plaintiff Laura Dziadek and against Defendant The Charter Oak Fire Insurance Company, plus costs to be taxed for Plaintiff and against Defendant.

DATED this **30**th day of September, 2016.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE